MARY KAY PATTERSON *vs.* LIBERTY MUTUAL INSURANCE
COMPANY & another.[1]

No. 98-P-956.

Suffolk. June 7, 1999. - February 18, 2000.

Present: JACOBS, LAURENCE, & BECK, JJ.

*Workers' Compensation Act,* Proximate cause, Expert opinion, Impartial medi-
cal examiner. *Evidence,* Expert opinion. *Witness,* Expert. *Multiple Chemi-
cal Sensitivity.*

The record at a hearing before an administrative judge of the department of
industrial accidents did not support the judge's conclusion that the
employee's diagnosed illnesses and disability were causally related to her
employment: the decision of the reviewing board affirming the judge's
decision in favor of the employee was reversed. [592-599]

APPEAL from a decision of the Industrial Accident Reviewing
Board.

*Allen Whitestone* (*Clyde B. Kelton, Jr.,* with him) for the
insurer.

*Scott A. Smith* for the employer.

*Stephen H. Oleskey* (*Daniel W. Halston* with him) for the
employee.

LAURENCE, J. In January, 1994, Mary Kay Patterson, an
anesthesiologist at the Brigham and Women's Hospital
(hospital), filed a claim with the Department of Industrial Ac-
cidents (DIA) for workers' compensation benefits against each
of her putative employers, the hospital and the Brigham and
Women's Hospital Anesthesia Foundation (foundation).[2] She al-

---

[1]Brigham and Women's Hospital, Inc.

[2]Despite a voluminous record, the exact nature of the foundation and of its
relationship to the hospital is not entirely clear. The DIA administrative judge
made no findings on the issue. The record indicates that the foundation (which
has no publicly identifiable place of business) appears in essence to represent
the incorporated anesthesiology staff of the hospital created in 1975 to provide

leged that she had developed disabling respiratory problems (chiefly asthma) and "hyper-allergic sensitivity to . . . skin" because of exposure to airborne toxic substances in the course of her employment at the hospital. An independent medical examiner appointed by a DIA administrative judge subsequently found that she suffered from "diffuse [or multiple] chemical sensitivity" syndrome (MCS). Following the proceedings described below, the DIA administrative judge awarded Patterson benefits for her medical expenses (plus costs and attorney's fees) apportioned between the two organizations.

After unsuccessful appeals to the reviewing board of the DIA (which summarily affirmed the judge's decision),[3] the hospital (which is a self-insurer for workers' compensation purposes) and Liberty Mutual Insurance Company (the workers' compensation insurer for the foundation) here seek to reverse the judge's determinations.[4] They contend that the judge committed two major reversible errors:[5] Liberty faults the judge for concluding that Patterson was an employee of the foundation as

---

exclusive anesthesia services at the hospital and to handle the billing and collection of fees for such services to hospital patients on behalf of the anesthesiologists, as well as to perform related administrative tasks. See note 13, *infra.*

[3]"[W]here, as here, the reviewing board summarily affirms and adopts without change the findings and decision of an administrative judge, a reviewing court 'must look to that decision to determine whether the action of the board [was] correct.' " *Coggin* v. *Massachusetts Parole Bd.*, 42 Mass. App. Ct. 584, 587 (1997), quoting from *Nowak's Case*, 2 Mass. App. Ct. 498, 499 (1974).

[4]Pursuant to G. L. c. 152, § 12(2), rule 2:04 of this court's rules for the regulation of practice before a single justice, and the court's standing order governing appeals from the Industrial Accident Reviewing Board, the appeal was entered on the docket of the single justice, who reserved and reported the case to a panel.

[5]On such an appeal, which is to be reviewed in accordance with the standards of G. L. c. 30A, § 14(7)(*a*)-(*d*), (*f*) & (*g*), "we consider . . . whether the decision is factually warranted and not '[a]rbitrary or capricious,' in the sense of having adequate evidentiary and factual support and disclosing reasoned decision making within the particular requirements governing a workers' compensation dispute." *Scheffler's Case*, 419 Mass. 251, 258 (1994). In so doing, we must ascertain whether the decision "contain[s] conclusions which are adequately supported by subsidiary findings which are not 'lacking in evidential support or . . . tainted by error of law.' " *Ballard's Case*, 13 Mass. App. Ct. 1068, 1069 (1982), quoting from *Paltsios's Case*, 329 Mass. 526, 528 (1952).

defined in the workers' compensation statute.[6] Both Liberty and the hospital (which conceded Patterson's claimed status as its employee) challenge the judge's adoption of an impartial medical examiner's opinion as to a causal relationship between Patterson's claimed medical problems and workplace conditions at the hospital.[7] We conclude that the judge did err as asserted with respect to the causation issue and reverse the DIA decision on that ground.[8]

*Factual summary.*[9] Patterson applied for appointment to the professional staff of the hospital in May, 1981. In June, 1981, she was offered a staff appointment as anesthesiologist, at a fixed salary, in the hospital's department of anesthesia. The offer came on hospital letterhead from the then-chairman of the hospital's department of anesthesia, who was also the ex officio president of the foundation (by virtue of a pro forma appointment by the hospital's board of trustees), but made no reference to the foundation. Each anesthesiologist appointed to the hospital staff by its board of trustees and to the Harvard Medical School faculty (as Patterson had already been while at the Massachusetts General Hospital) automatically became associated with the foundation. Patterson's duties involved three days a week of clinical service in the operating room anesthetizing hospital patients undergoing operations and instructing interns and residents in training there; two nonclinical days per week for research and "academic medicine"; and teaching duties at the Harvard Medical School. She neither admitted patients of her own to the hospital nor maintained a private office. Throughout the entire relevant period, Patterson received paychecks and benefits from both the hospital (approximately 16-20 per cent of her total remuneration) and the foundation (the remaining 80-84 per cent). The foundation was the contractually exclusive provider of anesthesia services for the hospital's patients, whom it directly billed for such services.

---

[6]Only an "employee" as defined in G. L. c. 152, § 1(4), as appearing in St. 1985, c. 572, § 9 — a "person in the service of another under any contract of hire, express or implied, oral or written [with certain exceptions not here relevant]" — has a right to compensation for a workplace injury. G. L. c. 152, § 26.

[7]The appellants advance other, lesser contentions as well, which we address only in passing in the course of this opinion. See notes 12-13, 15, & 18, *infra.*

[8]See note 13, *infra,* with respect to the issue of Patterson's alleged status as an employee of the foundation.

[9]This summary is based upon findings of the judge supported by admissible evidence and uncontested facts in the administrative record.

Until late 1992 Patterson experienced no significant health problems. At that time, she began to develop sensitivity to the latex gloves she wore in the operating room. Switching to non-latex gloves and using skin ointment eliminated the problem. In March, 1993, however, she developed a cough in the operating room and later other respiratory symptoms (shortness of breath, wheezing, and asthma attacks) that abated when she ceased working at the hospital but intensified when she returned to work. Treatment from various specialists and efforts to create allergy-free environments lessened but did not extinguish her symptoms. By August, 1993, she could no longer work and over the remainder of 1993 began to have respiratory distress symptoms when exposed to an increasing number of extra-hospital agents and situations (e.g., books, fragrances, vehicle exhausts, dry cleaning, cosmetics, newspapers). Ultimately, she had to remake much of her home and restrict many activities in order to minimize such exposures.

After the hospital and the foundation rejected Patterson's workers' compensation claims, a conference before a DIA administrative judge ensued, pursuant to G. L. c. 152, § 10A. At that conference, Patterson submitted her treating physicians' medical records, plus several engineering reports concerning environmental conditions at the hospital. The judge initially denied Patterson's claims for temporary total disability (under G. L. c. 152, § 34), partial disability (§ 35), and medical expenses (§§ 13 & 30). Patterson appealed for a de novo hearing pursuant to §§ 10A(3) and 11 only as to her claims for medical expenses.[10]

A § 11A impartial medical examination was thereafter ordered by the judge and performed by Dr. Christiani (IME), an internist specializing in occupational environmental medicine (which is not recognized as a certifiable specialty by the American Board of Medical Specialists). The IME had no personal knowledge of or experience in the hospital's operating rooms during the relevant period, nor any demonstrated expertise in the areas of toxicology, environmental engineering, or heating, ventilation, or air conditioning. The environmental

---

[10]Patterson at that point withdrew her §§ 34 and 35 claims, acknowledging that she had continued to receive the entire amount of her salary after she had stopped working, but moved to restore them on the last day of the administrative hearing. The judge denied that motion as prejudicial to the defending parties, a ruling Patterson has not challenged.

reports submitted at the conference were transmitted by the judge to the IME, along with the medical records from Patterson's treating physicians.

After examining Patterson, the IME filed his report in July, 1994. He opined that (1) Patterson suffered from latex hypersensitivity; asthma "triggered by exposure to agents, including latex and, in particular, by re-entry into the operating room areas at the Brigham and Women's Hospital where latex antigen has been shown to be elevated (as expected) . . . [although] other agents may also be responsible for triggering her asthma"; perennial sinusitis and rhinitis; and "Diffuse Chemical Sensitivity, some of which is consistent with irritant and allergen induced asthma attacks"; and (2) "[Patterson's] exposures at the Brigham and Women's Hospital did causally contribute to the development and progression of her condition . . . [and s]he is unable to return to that hospital's operating room and to any other operating room, utilizing similar materials."

The judge then conducted three days of evidentiary hearings between August and early November, 1994, during which the IME's report (but no other medical evidence) was admitted in evidence.[11] An additional day of medical testimony was subsequently introduced in the form of the deposition of the IME, conducted on November 15, 1994. Motions by the hospital and Liberty to strike the IME's report and deposition testimony and the environmental/engineering reports which the IME had consulted were later denied by the judge,[12] who, in February, 1995, adopted the medical opinions of the IME regarding

[11]At some point late in the proceedings, Patterson requested the opportunity to introduce additional medical evidence, but the judge denied the request. She has not challenged the judge's ruling in this appeal. Contrast *Lorden's Case, ante* 274, 280 (1999).

[12]The grounds for the motions were that (1) the IME's medical opinion lacked proper evidentiary foundation, relying in particular on hearsay information (the environmental reports) not admitted in evidence at the hearing; and (2) insofar as the IME's causation opinion relied on environmental conditions at the hospital, he lacked expertise in the area of environmental engineering upon which to render any expert opinion. The basis for the judge's denial of the appellants' motions with respect to the reports was that their objections to the reports, not having been made at either the conference or the three days of hearings, were untimely. That ruling was clearly erroneous and arbitrary. Only "documents included in the medical records" require objections at the conference level, 452 Code Mass. Regs. § 1.10(2)(c) (1993), and those reports were not such documents. At the hearing, the judge explicitly allowed the appel-

diagnosis and causation and determined that Patterson was concurrently employed by both the hospital and the foundation. As to the foundation's denial of Patterson's employee status, the judge found to the contrary, based upon the foundation's payment of salary and fringe benefits to Patterson, the identification of Patterson as an employee on W-2 forms and other tax documents, and a 1993 workers' compensation audit that identified the foundation as the policyholder and its affiliated anesthesiologists, including Patterson, as the insureds.[13]

lants to reserve their objections until after the deposition of the IME. At the deposition, they persistently and vehemently objected to the reports upon learning of the extent of the IME's reliance thereon, which had not been clear from the IME report itself.

[13]Although we need not address the issue to dispose of this appeal, we note our doubt as to the correctness of the judge's determination that Patterson was an employee of the foundation, both as matter of law and on the record. The judge failed to utilize, or even mention, the standard of analysis for determining employee status under the workers' compensation act, which is the same as that of the common law of agency. Under that test, the finder of fact must identify "who has direction and control of the employee and to whom does he owe obedience in respect of" the performance of his work; or, at least, identify who "retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished." *Chisholm's Case*, 238 Mass. 412, 419-420 (1921).

In particular, the judge ignored the "essence of the distinction" between an employee eligible to receive workers' compensation benefits and an ineligible independent contractor, namely "the right of control. . . . Other considerations and tests are important only as they bear upon the right of control." *Mc-Dermott's Case*, 283 Mass. 74, 76 (1933). See *Donnelly's Case*, 304 Mass. 514, 519-520 (1939); *Hartman's Case*, 336 Mass. 508, 510 (1957); *Brigham's Case*, 348 Mass. 140, 141-142 (1964); *O'Malley's Case*, 361 Mass. 504, 505 (1972); Restatement (Second) of Agency § 220(1) (1958); Locke, Workmen's Compensation § 141 (2d ed. 1981). The judge did not examine, as he was obliged to do, "all the circumstances" of the workplace situation in his analysis of employee status, the most important factor being the right and extent of control of the purported employee's work. *Strong's Case*, 277 Mass. 243, 246 (1931). See *Khoury* v. *Edison Elec. Illuminating Co.*, 265 Mass. 236, 239 (1928); Restatement (Second) of Agency § 220(1) & (2) and comments d & h.

Our appellate courts have consistently held that, by virtue of the specialized skill and independent judgment which physicians are required to possess and exercise in order to discharge their paramount professional duty of serving their patients' interests above all else, physicians (at least those who are not residents or interns or retained on full-time salary by a particular corporate employer to service its employees or customers) are examples par excellence of independent contractors — regardless of hospital staff affiliation or source of salary. See *Kapp* v. *Ballantine*, 380 Mass. 186, 195 (1980); *Harnish* v.

*Discussion.* It is axiomatic that an employee has the burden of establishing, by a preponderance of the evidence, all the elements of her claim for workers' compensation benefits, including the fact of the requisite causal connection between her injury and workplace events or conditions; and that she cannot prevail if any critical element is left to surmise, conjecture or speculation or otherwise lacks evidential support. *Sponatski's Case,* 220 Mass. 526, 527-528 (1915). *Ruschetti's Case,* 299 Mass. 426, 431-432 (1938). See *Phillips's Case,* 41 Mass. App. Ct. 612, 618 (1996).

In particular, the expert medical opinion as to that causal relation which the employee must obtain in order to prevail (when the matter is, as here, beyond the common knowledge of the ordinary layperson) has to be expressed in terms of probability, not mere possibility. *Sevigny's Case,* 337 Mass. 747, 749-750 (1958). That opinion must further be based solely on the expert's "direct personal knowledge" or admissible evidence in the record and not on assumptions that are not established by such evidence. *Commonwealth* v. *Roman,* 414 Mass. 235, 238 (1993). See *Haley's Case,* 356 Mass. 678, 681-682 (1970); 452

---

*Children's Hosp. Med. Center,* 387 Mass. 152, 159 (1982); *Kelley* v. *Rossi,* 395 Mass. 659, 661-663 (1985); *Williams* v. *Hartman,* 413 Mass. 398, 400-401 (1992); *Chase* v. *Independent Practice Assn.,* 31 Mass. App. Ct. 661, 665 (1991); *Reida* v. *Cape Cod Hosp.,* 36 Mass. App. Ct. 553, 554 (1994). Compare *McMurdo* v. *Getter,* 298 Mass. 363, 364 (1937) (physician-optometrist employee of eyeglass retailer).

The administrative judge failed to acknowledge these established legal principles, much less to apply them, by assessing the record in order to determine whether any evidence tended to show that Patterson was subject to the direction and control of the foundation in the performance of her professional duties. Indeed, as Liberty asserts, there appears to be little, if any, evidence of such control. The record is, rather, replete with evidence that it was the hospital that supervised and controlled the details of Patterson's work. Patterson was in fact unable to identify any foundation officer or employee acting as such who was responsible for supervising or controlling her performance as a physician in any respect.

In short, although the issue whether a claimant is an employee for workers' compensation purposes was an ultimate question of fact for the judge's determination, that conclusion should be set aside if not justified by the evidence or by the subsidiary findings, as it appears not to have been here. See *Donnelly's Case,* 304 Mass. at 516; *Ballard's Case,* 13 Mass. App. Ct. at 1069; *Madariaga's Case,* 19 Mass. App. Ct. 477, 481 (1985). In view of our reversal on the causation issue, we do not in any event have to treat Liberty's complaint about the allocation of a substantial portion of Patterson's award to the foundation as a supposed coemployer.

Code Mass. Regs. § 1.11(5) & (6) (1993). Cf. *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531 (1986) ("an expert [may] base an opinion on facts or data not in evidence if the facts or data are independently admissible"). If the DIA factfinder rests his ultimate conclusion as to causality on an expert's opinion which does not satisfy these standards, that conclusion is lacking in the required evidential support and cannot be affirmed. *Sevigny's Case,* 337 Mass. at 749-754; *Hachadourian's Case,* 340 Mass. 81, 85-86 (1959). Such is the instant situation, in which a deficient IME's report was the sole evidence of causation relied on by the judge.

We note initially a structural defect in the IME's report that (while not in and of itself fatal) was a portent of the underlying inadequacy of his causation opinion. General Laws c. 152, § 11A(2), as amended by St. 1991, c. 398, § 30, requires the IME's report to "contain a determination [inter alia] . . . whether or not within a reasonable degree of medical certainty any . . . disability [of the claimant determined by the IME to exist] has as its major or predominant contributing cause a personal injury arising out of and in the course of the employee's employment." Here, however, the report failed to state any aspect of the IME's opinion as being within a reasonable degree of medical certainty or that any particular workplace event or condition was the major or predominant cause of Patterson's disabling respiratory problems or claimed MCS. His assertion that Patterson's exposures to latex and unspecified operating room agents at the hospital "did causally contribute" to those problems fell far short of that requirement.[14]

Nor did the IME's deposition testimony eliminate or

---

[14]The parties have argued the causation issue exclusively in terms of the compliance vel non of the IME's report and testimony with the quoted standard set forth in G. L. c. 152, § 11A(2) (whether the employee's disability has as "its major or predominant contributing cause" a work-related personal injury). Had Patterson based her claim on having suffered a compensable, work-related personal injury that had combined with a preexisting condition to cause her disability or her need for medical treatment, she could have prevailed to the extent she could prove that the work-related injury was "a major but not necessarily predominant cause of" such disability or need for treatment. See G. L. c. 152, § 1(7A), as amended by St. 1991, c. 398, § 14. She did not, however, so characterize her claim or her evidence. Moreover, the judge twice expressly found that, notwithstanding some evidence of isolated but unspecific past allergic reactions, Patterson had no history of asthmatic or respiratory sensitivity or problems, i.e., no preexisting conditions, at the time she first became ill in the operating room in March, 1993 (a finding made in response

compensate for his report's inadequacies. He several times admitted that he could not identify and did not know what asthma-inducing allergen or toxin Patterson might have come in contact with at the hospital, other than latex. Even as to latex — which he did think "within a reasonable degree of medical certainty . . . was . . . more likely than not a problem" — he acknowledged that Patterson herself had testified that exposure to latex had produced a skin rash but not respiratory problems; that he had no actual evidence Patterson in fact had an allergy to latex which could produce a respiratory response (the establishment of which required special tests never administered to Patterson); and that he had no information regarding the levels of latex in the hospital operating rooms but rather relied on "reasonable assumption[s]" about hospital operations generally and on certain of the environmental reports he had received from the judge which "suggest[ed] that latex allergy had been a problem" in the hospital operating rooms. His deposition opinions as to latex came down to his "think[ing]" that a latex allergen "may develop, precipitate asthma attack in her" and "more likely than not latex was a problem with her." Notwithstanding his deposition elaboration, the IME came nowhere close to opining that either latex or any other substances (none of which he could identify) was the, or even a,

---

to Liberty's apparent initial contention, not advanced on appeal, that Patterson did not suffer a compensable "personal injury" as defined in § 1[7A]). The judge did go on, in what amounted to somewhat confusing administrative dictum couched in the language of § 1(7A), to state that "[i]n any event I find that a fair reading of [the IME's] report and deposition indicate that Dr. Patterson's employment related respiratory condition is a major cause of her disability and needed treatment." This statement, reflecting the judge's apparent belief that Patterson had satisfied the standard of proof under § 1(7A) — which is clearly lower than that imposed upon the IME's causation opinion pursuant to § 11A(2)(iii) — does nothing to save the judge's award, for several reasons. First, the IME's report and deposition nowhere identify, or provide logical support for identifying, *any* "major" cause of Patterson's condition or need for treatment, but rather speak only in terms of "problem[s]" and "contribut[ing]" causes of unspecified magnitude. Second, the judge's reiterated findings as to the absence of preexisting conditions make the § 1(7A) standard irrelevant to the issue of compensability, as the parties themselves acknowledged in focusing their arguments on the sufficiency of the IME's report under § 11A(2) as to the issue of causation, and by never mentioning the lower standard of § 1(7A). Finally, and most significantly, since the IME's opinion was founded upon inadmissible evidence (as is explained below), the award cannot be sustained, whatever causation standard applied.

major or predominant contributing cause of Patterson's disabling injury.

The facial shortcomings in the IME's report and supporting testimony reflect the more fundamental defect that there was no competent evidentiary basis for his causation opinion. Most fatally, his conclusions regarding Patterson's exposure to latex impermissibly rested on assumptions and information not established (as was required) by his own direct personal knowledge or by admissible evidence in the record. Patterson, on whom the burden lay, proffered no testimony, expert or lay, and no admissible exhibits regarding air quality or the presence of any potentially asthma-inducing agents in any part of the hospital. Instead, she relied entirely on a few nonmedical engineering reports — not made part of the administrative record — which apparently described certain environmental conditions at the hospital, including the operating room where she worked. Those reports were the only sources of information regarding latex problems aside from the IME's claimed knowledge of hospital conditions generally.

Patterson submitted those reports at the informal § 10A conference (which is not subject to the rules of evidence) but never authenticated them or formally introduced them in evidence. They were entirely hearsay documents for which no recognized hearsay exception was ever claimed or proffered, or, so far as we can tell, exists.[15] Nonetheless, at the § 11 stage of the process — which must be conducted as a de novo hearing solely on the basis of evidence therein introduced and admissible under the rules of evidence applied in the courts — the judge permitted those unadmitted and inadmissible documents to be sent to the IME. Despite the fact that DIA regulations specify that the IME should receive and rely on as documentary evidence only *medical* records and reports, see 452 Code Mass. Regs. §§ 1.10(2)(b), 1.11(6), 1.14(2) (1993) (which *are* documents within established hearsay exceptions, see G. L. c. 152, § 20; c. 233, § 79; *O'Brien's Case*, 424 Mass. 16, 23 [1996]),

---

[15]Patterson makes no effort to demonstrate that the unintroduced reports would have qualified under the business records exception to the hearsay rule, see G. L. c. 233, § 78, nor does anything in the administrative record suggest that the reports were made by employees whose business duty it was to create them in the regular course of business operations. Rather, it seems clear that the reports were the nonregular, ad hoc products of independent consultants.

the IME proceeded to review and, at least in part, rely upon those same hearsay reports.[16]

The result was a medical opinion, even were it not facially wanting, contrary to the governing regulations and to this Commonwealth's rules of evidence as to the permissible bases for expert opinions. See discussion *supra* at 592-593.[17] To the extent the IME claimed at deposition that his opinion would not have "substantially" changed had he lacked those reports — which claim the judge found credible — he effectively acknowledged that the opinion was based entirely on Patterson's dermal latex sensitivity, on the post-March, 1993, reports of her treating physicians who diagnosed her asthmatic condition, and on his

---

[16]No decision has explicitly recognized the proposition stated in the text as to the limitation on the information provided to an IME for use in formulating his opinion, but that conclusion seems logically inescapable based upon the cited regulations, as well as the statute (G. L. c. 152, § 11A[2], which expressly limits an IME to consideration of "medical issues" and the expression of opinion in terms of "medical certainty" and "medical end result[s]"), and controlling case law (see *Scheffler's Case*, 419 Mass. at 256-258, emphasizing the statutory restriction and concluding therefrom that only the medical issues in an IME report are entitled to be treated as ‍prima facie evidence). Cf. 452 Code Mass. Regs. § 1.12(5)(b) (1993), restricting the use of the IME's deposition as "medical evidence only." It may be that even under these authorities an IME can permissibly be provided nonmedical records and reports for use in framing his expert medical opinion when such evidence is shown to be both independently admissible and of a type reasonably relied upon by physicians as a permissible basis for formulating an opinion. See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 528-532; *Commonwealth* v. *Daye*, 411 Mass. 719, 741-742 (1992); Liacos, Massachusetts Evidence § 7.10.2, at 419-420 (6th ed. 1994); Young, Pollets, & Poreda, Massachusetts Evidentiary Standards, Evidentiary Standard 703(c) (2000 Supp. to Hughes, Evidence). Patterson would not be aided by such an expansion of the IME's evidentiary universe, however, because she made no such showings.

[17]The IME's report stated that he had reviewed the hearsay reports and suggested his partial reliance on them by mentioning that "latex antigen has been shown to be elevated (as expected)" in the hospital's operating room areas (the reports being the only direct source for such information). During his deposition, the appellants explored the IME's reliance on those reports, with somewhat conflicting responses from the IME. At one point, the IME said that the studies were significant in "suggest[ing] that latex allergy has been a problem and that there are some other things used in the operating room area that had caused some difficulties with staff"; but later he asserted that he had not relied on the reports "exclusively" even though such "background information" was reviewed and used to formulate his causality opinion. He finally claimed that even without the reports his opinion would not have "substantially" changed.

own claimed knowledge of typical conditions in hospital operating rooms and other medical areas (though not specifically at the hospital itself). None of those sources, however, provided an iota of expert or admissible evidence regarding the actual, as opposed to the hypothesized, presence of latex or any other asthma-causing substances in the hospital operating room or other hospital areas in which Patterson had worked. As such, it was merely an unsubstantiated opinion based on assumed facts not established by the admissible evidence and thus the product of surmise and conjecture as to the existence of *any* causal connection, much less the "major or predominant contributing cause."[18]

The judge thus rested his causation decision on an IME's report that was not only expressed in terms of mere possibility but was also unsupported by admissible evidence in the record or on any other proper basis. As such, the IME's report was not entitled to any evidential weight, much less the status of prima facie evidence, see G. L. c. 152, § 11A(2), which the judge incorrectly accorded it. See 452 Code Mass. Regs. § 1.11(5) & (6) (1993) (medical report, or any part thereof, to be struck on motion when not based solely on the expert's direct personal knowledge or admissible evidence in the record); *Ruschetti's Case*, 299 Mass. at 431 (mere conjecture by expert as to causation based on equivocal facts "has . . . no evidential value"); *Sevigny's Case*, 337 Mass. at 749 (medical expert opinion as to causation expressed in terms of "possible causal relationship

---

[18]The parties advance extensive arguments addressed to the MCS portion of the IME's causality opinion, with the appellants vigorously arguing that MCS is not a recognized medical diagnosis and fails to meet the standard of evidentiary reliability established by *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994) (adopting the test set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 [1993]); while Patterson contends that the appellants did not raise the issue below, that the IME's opinion has not been shown to violate the *Lanigan-Daubert* tests, but, more importantly, that MCS was not the real basis for the IME's opinion, "the essence of" which was the diagnosis of "environmentally induced asthma" in response to workplace substances (the only identified such substance being latex). We need not resolve the parties' dispute regarding this interesting issue, see generally *Canavan's Case*, 48 Mass. App. Ct. 297, 299-301 & n.1 (1999), because the IME's causality opinion as to MCS (and the judge's decision founded thereon) suffer from exactly the same flaws as have been discussed above. Indeed, the IME's opinion had even less substance, based upon his essentially conjectural statement that Patterson's MCS was merely "consistent with" asthma induced by exposure to unnamed and unknown irritants and allergens.

. . . would have to be disregarded"); *Buck's Case*, 342 Mass. 766, 770-771 (1961) (expert causality opinion based upon misstatements or omissions of material facts is entitled to no weight); *Bagge's Case*, 369 Mass. 129, 134 (1975) (same); *Lettich's Case*, 403 Mass. 389, 393 (1988) (DIA reviewing board found that expert opinion based on facts not in evidence "must be rejected" and could not support a decision favorable to the employee); *Scheffler's Case*, 419 Mass. 251, 257-259, 260 n.5 (1994) (prima facie effect is to be accorded only to medical opinion as to medical issues based on accurate and complete facts and a competent evidentiary foundation in the record); *Collins's Case*, 21 Mass. App. Ct. 557, 563 (1986) (expert opinion based on either evidence not properly introduced or facts not proven should be struck on motion of the objecting party); *Coggin* v. *Massachusetts Parole Bd.*, 42 Mass. App. Ct. 584, 588-589 (1997) (IME report is not to be admitted as prima facie evidence when based on inaccurate assumptions).[19]

The ultimate causality conclusion of the judge — who had no power to admit evidence at the hearing in a manner contrary to the DIA regulations or the rules of evidence (at least when such evidence is properly objected to) — consequently was itself not grounded, as it must be, on a competent evidentiary record. It thereby contravened the fundamental principles that the appellants were "entitled to a decision based [solely] on the evidence presented at the hearing . . . [, that n]othing can be considered or treated as evidence which is not introduced [and admitted] as such . . . [and that] the [judge's] decision on a work[ers'] compensation claim may not be based on facts not introduced in evidence . . . ." *Haley's Case*, 356 Mass. at 681-682. See 452 Code Mass. Regs. § 1.11(5) (1993); *Hachadourian's Case*, 340 Mass. at 86.

Patterson in the end failed to present, as she was obligated to do, any expert medical evidence that would establish, by a

---

[19]Contrast *Canavan's Case*, *ante* at 298-302, where the expert causality opinion (which in that case was provided by the employee's doctor rather than an IME), that the employee (a nurse) suffered from MCS caused by conditions at the same hospital as here involved, was based not merely on his claimed knowledge of MCS generally, but also on the identification of specific chemicals present in the employee's workplace (ethylene oxide, formaldehyde, diesel fuel) and on the facts that the expert was the employee's treating physician, had performed a number of highly relevant diagnostic tests on the employee, and had personal knowledge of other similarly situated patients he had treated. None of those factors is here present.

preponderance of the evidence, that her diagnosed illnesses and disability were causally related to her employment in any way, and in particular that her disability had as its major or predominant contributing cause any specific workplace condition or particular irritant therein. It follows that the reviewing board's decision in her favor must be reversed. See *Sevigny's Case,* 337 Mass. at 753-754, and cases cited.

*So ordered.*